FILED
2012 Mar-30  AM 09:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MARSHALL, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No. 2:08-cv-1282-SLB** |
| | } | |
| DEPARTMENT OF VETERANS | } | |
| AFFAIRS, ERIC SHINSEKI, | } | |
| SECRETARY, | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is presently before the court on Defendant's Motion for Summary Judgment.  (Doc. 31.)[1]  Plaintiff Nancy Marshall alleges that defendant, Secretary of the United States Department of Veterans Affairs ("VA" or "defendant") retaliated against her for her past complaints of discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), *et seq*.  (Doc. 6 ¶ 11.)  Plaintiff also brings a claim for constructive discharge.  (*Id.* ¶¶ 13-16.)  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 31), is due to be granted.

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  STATEMENT OF FACTS[2]

From 1998 until November 2008, plaintiff was a part-time employee of the VA where she worked two days per week as a speech pathologist.  (Doc. 33-1 at 10, Doc. 33-2 at 117.)  She worked at the VA Hospital in Birmingham, Alabama until 2005, when she was transferred to the VA clinic in Jasper, Alabama.  (Doc. 33-1 at 51.)

---

[2]  As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to plaintiff, the nonmoving party.  *See, e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).

In 2005, Dr. Doreen Oyadomari was the chief of the audiology and speech pathology department at the Birmingham VA and was plaintiff's direct supervisor. (Doc. 45-1 at 21-22; Doc. 33-1 at 51-52.) Following Dr. Oyadomari's retirement in December 2005, Lynn Arnold, a full-time speech pathologist who had been working at the Birmingham VA Medical Center since 1972 was appointed acting chief of the audiology and speech pathology department and became the permanent chief of that department in June 2006. (Doc. 45-1 at 8-9, 21-22; Doc. 34-11 at 59.) As the new chief of the audiology and speech pathology department, Arnold became plaintiff's direct supervisor and remained plaintiff's direct supervisor until plaintiff resigned her position at the VA in November 2008. (Doc. 33-1 at 51-52; Doc. 22 p.4 ¶ 6.) Arnold is one of the alleged discriminating officials in this case. (Doc. 33-1 at 46-47.) Starting in 1997, Dr. William Blackburn was the associate chief of staff at the Birmingham VA Medical Center and was Plaintiff's second-level supervisor. (Doc. 34-11 at 13-14, 38; Doc. 33-1 at 51-52; Doc. 45-1 at 11.) At all times relevant to this lawsuit, Ramona Faucett was the lead speech pathologist at the Birmingham VA Medical Center and, in addition to her patient caseload, handled numerous administrative duties such as assignment of new patients. (Doc. 35-1 at 10-14.)

The Birmingham VA Hospital is the primary Veterans Affairs Hospital in Alabama. (Doc. 45-1 at 30.) The Birmingham VA operates a number of Community Based Outpatient Clinics (CBOC) in outlying communities, including one in Jasper, to

4

serve the primary care needs of veterans on an outpatient basis.  (Doc. 34-11 at 62; Doc. 40-3 at 19-21.)  Dr. Salid Hussain worked as a primary care physician at the Jasper clinic from 2001 to the summer of 2007.  (Doc. 40-3 at 11, 15.)  David Pearce was the manager of the Jasper clinic from 2002 to 2008.  (Doc. 40-2 at 10-11.)

In 2005, Dr. Blackburn approved a suggestion from Dr. Oyadomari to reassign plaintiff from the Birmingham VA Medical Center to the Jasper Clinic in order to provide speech pathology services "closer to where veterans were."  (Doc. 34-11 at 39-40.) Pearce testified that, when plaintiff was being considered for a transfer to Jasper, Dr. Oyadomari presented him with some data regarding where patients lived in relation to Jasper.  (Doc. 40-2 at 20-21.)  Pearce testified that the data did not impress him as far as demonstrating a need for a speech pathologist in that area.  (*Id.* at 21.)  Pearce also testified that part of the reason plaintiff was transferred to Jasper was because she was a "problem employee" within her department and the other employees did not get along with her.  (*Id.* at 19.)  Faucett testified that plaintiff was assigned to the Jasper Clinic because it was the closest clinic to Birmingham and made it feasible for plaintiff to commute. (Doc. 35-1 at 22.)

Prior to filing the administrative EEO complaint which forms the basis of her pending complaint, plaintiff had initiated two previous administrative EEO complaints against the VA, one in 2003 and one on June 15, 2005.  (Doc. 33-5; Doc. 33-1 at 26, 29-30; Doc. 6 ¶ 8.)  Plaintiff filed the EEO complaint in 2005 after she was assigned to the

Jasper Clinic.  The administrative proceeding for that complaint was identified as EEOC # 420-2006-00034X  ("EEOC # 0034").  (Doc. 33-5.)  In 2005, when Dr. Oyadomari retired and Arnold took over as acting chief of the audiology and speech pathology department, Dr. Oyadomari informed Arnold that Oyadomari was involved in the EEO case brought by plaintiff.  (Doc. 45-1 at 22-23.)  Plaintiff's complaint in EEOC # 0034 included allegations of hostile environment and harassment because of prior protected EEO activity.  (Doc. 33-6 at 33-34.)  After a hearing on July 26, 2006, an administrative law judge entered a decision in favor of the VA on September 12, 2006.  (Doc. 33-5.)  Plaintiff did not appeal the decision in EEOC # 0034 or file a timely *de novo* complaint in district court regarding that proceeding.  (Doc. 33-1 at 37.)

Plaintiff's complaint in EEOC # 0034 concerned not only her transfer to the Jasper Clinic but also numerous other issues and allegations which plaintiff alleged constituted a hostile environment, including the following: she had been "subjected to an inequitable caseload assignment;" she was denied authorization to visit the Walker Baptist Medical Center to investigate the facility's physical plant and services; she was forced to work at the Jasper Clinic "without supervisory directives for protocol and procedures;" her supervisor failed to provide her certain written information and training; she was paid a lower salary than other speech pathologists; her supervisor failed to provide her certain information after such was requested; she was denied her request for a government vehicle and her "accrued unofficial compensation time" was rescinded; she was not

included in certain emails concerning her duties; she was "held to a review of the third set of performance standards;" she was not allowed equipment that she needed to provide patient care; her supervisor "placed her in an unprofessional position by asking a physician for a consult referral on a patient that the complainant had not seen;" she was spoken to in a derogatory manner when she expressed her concerns about her performance measures; she was presented a second set of performance measures; she was "prohibited from identifying service facilities and providers . . . for building caseloads and meeting veterans;" "her supervisor failed to advise the Chair of the Traumatic Brain Injury (TBI) Team that she would be removed from the team because of her reassignment;" her supervisor failed to provide a response to a written list of questions about her reassignment; and her supervisor refused to discuss the reassignment with her. (Doc. 33-5 at 5-12.)

In the current case, plaintiff alleges that she was subjected to numerous adverse actions, enumerated and discussed below, in reprisal for her prior EEO activity.

**a. Jasper Caseload and Performance Measures**

The speech pathology department at the VA is a "consultive service," and receives patients by way of referrals from primary care physicians at the VA Hospital and the Community Based Outpatient Clinics.  (Doc. 45-1 at 30, 35.)  Once she received them, Faucett would decide how to disburse the referrals among the three pathologists assigned to the Birmingham VA Hospital: either herself, Angie Tidwell or Carlene Ozley.  (*Id.* at

30-31, 33-35.)  Arnold would review the number of consults the plaintiff received approximately every four to five months. (*Id.* at 35.)

Each speech pathologist at the VA was expected to meet a set of goals known as "performance measures."  (*Id.* at 54-56.)  One of those goals is to have a certain number of patient visits a year.  (*Id.* at 54-55, 57.)  The expected number of patient visits is based on a national standard.  (*Id.* at 61-62.)  The three full-time speech pathologists assigned to the Birmingham VA Hospital were each expected to have 1,125 patient visits per year. (*Id.* at 57.)  As a part-time employee (16 hours per week), plaintiff was expected to have forty percent of 1,125 visits, or 450 patient visits per year or 4.69 patient visits per day. (*Id.* at 56.)  From January 2006 to December 31, 2008, plaintiff saw a total of 727 patients, which would not have met her performance standards for that time period.  (*Id.* at 104, 109; Doc. 34-7 at 19-21.)  However, plaintiff received "fully successful" performance reviews while she was at the Jasper clinic, including the "productivity and efficiency" element of her reviews, which covered the expected numbers of patient visits per year.  (Doc. 45-1 at 110, 116-18; Doc. 34-8 at 14, 16, 17, 28, 29.)

At least since 2002, when plaintiff still worked at the Birmingham VA, plaintiff has complained about her low caseload to her VA supervisors.  (Doc. 33-6 at 103.)  In response to plaintiff's complaints of insufficient patient caseload at the Jasper Clinic, Arnold suggested several remedies, including using support groups.  (Doc. 45-1 at 40.) However, because of the lack of patients in the Jasper area, this was not a viable option.

8

(*Id.* at 441-42, 119-20.)  Arnold suggested that inpatients who were discharged from the Birmingham VA Hospital and who lived in the Jasper area be referred to plaintiff for follow-up care.  (*Id.* at 40-41.)  Arnold also suggested that plaintiff educate the staff at the Jasper clinic about the speech pathology services that she could provide to outpatients at the clinic, which she did.  (*Id.* at 41, 50.)  Plaintiff also attempted to build a patient caseload by screening and evaluating each veteran who came to the Jasper Clinic for treatment.  (*Id.* at 78-79).

Plaintiff was not provided clinical assessment tests, therapy books, or speech pathology equipment while Arnold was chief of the department, but Arnold testified that plaintiff would have been provided materials if she had requested them.  (Doc. 45-1 at 74-75.)  Plaintiff claims she was supposed to receive videos of the VA's modified barium swallow (MBS) patients so she could base her therapy on the videos, but she never received any.  (Doc. 33-2 at 111-12.)  At one point, plaintiff suggested establishing a relationship with a local hospital to provide radiology services for the MBS patients, but her suggestion was rejected because of conflict-of-interest issues.  (*Id.* at 112.)

Between February 2006 and June 2007, plaintiff contacted Arnold and/or Blackburn around ten times to discuss her performance measures and her low patient caseload, to seek information on why plaintiff was being kept in Jasper despite the low patient caseload, to seek help in building a caseload, and to request a transfer to Birmingham or another clinic with more patients.  Plaintiff communicated her concerns in

9

writing and also in person.  (Doc. 33-1 at 50-51, 67-70; Doc. 45-1 at 38, 64, 111-12, 121-30; Doc. 45-2 at 130-36, 154-55; Doc. 40-9; Doc. 40-10; Doc. 40-13; Doc. 40-19.) Plaintiff was not provided the information regarding Jasper patients for patient confidentiality reasons and was denied reassignment to Birmingham. (Doc. 45-1 at 113-15; Doc. 45-2 at 10-11.)

Arnold testified that her predecessor, Dr. Oyadomari, set certain goals for plaintiff regarding development of a caseload at the Jasper Clinic that Arnold felt were realistic and attainable.  (Doc. 34-10 at 8-10; Doc. 45-1 at 52-56.)  Arnold testified she had discussions with Faucett to insure that Faucett was sending plaintiff all appropriate referrals.  (Doc. 45-1 at 65-66.)  Arnold also testified that she spoke to Dr. Blackburn about plaintiff's caseload concerns and Dr. Blackburn felt that it was important to keep plaintiff at the Jasper Clinic in order to meet the VA's goal of providing specialty care at the community based clinics.  (*Id.* at 67.)

**b. Plaintiff's Requests to Attend Texas & Tennessee Conferences**

In April 2006, Arnold informed plaintiff that plaintiff was being investigated for fraud regarding an incident with Angie Tidwell's "trip ticket," or travel voucher, that Tidwell had obtained to attend an upcoming National VA Speech Pathology Conference in Texas.  (Doc. 33-1 at 53-57; Doc. 45-2 at 33-36; Doc. 40-12.)  Arnold had signed a "trip ticket" for Tidwell to requisition a government car to attend the meeting.  (Doc. 45-2 at 34-36.)  Plaintiff's name had not been on the authorization document at the time

Arnold signed it and Arnold had not approved plaintiff's attendance at the conference. (*Id.* at 36-37.)

Plaintiff testified that when Tidwell learned plaintiff would be attending the conference, Tidwell asked VA Security whether plaintiff's name could be added to Tidwell's trip ticket, and plaintiff then signed her name to the ticket. (Doc. 33-1 at 61-62.) When Arnold became aware of the addition of plaintiff's name to the form, she contacted her supervisor, Dr. Blackburn, about the issue. (Doc. 45-2 at 35-36.) Arnold contacted VA security and accused the plaintiff of fraud; however, fraud charges were never actually brought against plaintiff. (Doc. 33-1 at 54, 55; Doc. 33-2 at 119; Doc. 45-2 at 48-49.) VA Security informed the plaintiff that her job was being threatened due to the fraud accusation. (Doc. 33-1 at 58.) On April 26, 2006, plaintiff was called to a meeting with Arnold and a union representative, where Arnold informed her that "[s]ecurity has brought to my attention that they are investigating you for fraud" concerning the travel voucher which had been "whited out" in one section and had plaintiff's name added as one of the travelers. (Doc. 33-1 at 53-57.) Plaintiff explained that she had not been the person who had whited out the voucher and the white-out and addition of her name to the voucher had been at the instruction of the police chief's secretary. (Doc. 33-1 at 53-62; Doc. 45-2 at 38.) The Chief of Security confirmed plaintiff's story. (Doc. 35-12, Ex. 15, B2 at 11-14.)

Plaintiff then asked Arnold why Arnold had accused her of fraud and reported her to VA Security before talking with her and Tidwell.  Plaintiff testified as follows:

> I said, Lynn, why in the world would you not just call me and ask me if I am going to the meeting? I said, I am not trying to hide anything.  I said, I don't sign my signature in bold, black ink on a travel voucher if I am trying to hide something. I said, Why in the world would you do that? Why would you take these unprecedented steps? I said, You didn't even talk to Angie Tidwell who did the trip ticket. I said, The police chief sat there and told you he remembered.
>
> She [Arnold] said, Well, I had to go on the information I had at the time; and she said, And we are doing all of this because of your past EEO – that EEO thing that you did.
>
> I said, My EEO reprisal suit?
>
> She said, Yes, your EEO thing.

(Doc. 35-12 at 20, Ex. B1 at 39-40.)  Plaintiff was eventually allowed to attend the conference in the government vehicle, but had to have the absence approved by Human Resources.[3]  (Doc. 33-2 at 103-05; Doc. 45-2 at 43-44; Doc. 35-12, Ex. 15, B2, at 15-16.)

Plaintiff testified that the reason she thought Arnold discriminated against her by not allowing her to go to the conference was because Arnold waited until the last minute to tell her that she could not attend.  (Doc. 33-1 at 63-64.)  According to plaintiff, Arnold told her that she could not attend the conference because she had gone the previous year.

---

[3]    Plaintiff claims that, at the conference, one of the coordinators told her that Arnold had contacted the coordinator to ask questions about plaintiff's registration, and the coordinator told plaintiff, "It was very evident that [Arnold] had trust issues with you."  (Doc. 33-1 at 64-65.)  However, as defendant points out, (doc. 43 at 8 ¶ 69), this proposed fact is based on the hearsay statement of a non-party and, therefore, will not be considered as evidence in opposition to summary judgment.

Arnold allowed only one clinician, Carlene Ozley, to attend, although plaintiff claims that two speech pathologists were allowed to attend the conference the subsequent year. (*Id.* at 63.) Arnold testified that the reason she did not give plaintiff permission to attend the conference was because she had already given Tidwell permission to attend, and, because the Hospital had limited funds to pay for travel for employees, they could only pay for one speech pathologist to go. (Doc. 45-2 at 43.)

In 2007 or 2008, plaintiff asked Arnold for permission to attend an audiology conference at the Mountain Home VA Hospital in Tennessee because she was performing audiology work at the Jasper clinic, but Arnold denied her request. (Doc. 33-2 at 100-102.) Arnold testified that she did not allow plaintiff to attend the audiology conference because it was for full-time audiologists and there was limited enrollment. (Doc. 45-2 at 24-25.) When asked in her deposition if plaintiff's attendance at the audiology conference would have benefitted her and the services she was providing to veterans, Arnold responded, "I guess there is that potential." (*Id.* at 27.) In her deposition, plaintiff could not remember any specific incidents or dates where she was denied training in Birmingham, nor did she address any such incidents with an EEO counselor. (Doc. 33-2 at 102-03, 105.)

**c. Request to Travel to Birmingham VA from Jasper**

On May 11, 2006, plaintiff made a request to Faucett, the then-acting chief for the day, to allow plaintiff to travel to the Birmingham VA from the Jasper clinic in order to

"review therapy materials and to talk with Human Resources and to present an application for the then-available Chief position." (Doc. 33-4 at 9.) According to plaintiff, Faucett contacted Dr. Blackburn regarding plaintiff's request and Dr. Blackburn denied plaintiff's request because her "time would be better spent developing the caseload in Jasper." (*Id*.; Doc. 35-3 at 7.) Plaintiff was given the option of using her annual leave to travel to the Birmingham VA, which she did. (Doc. 40-13, 1-2.)

Faucett testified that she contacted Dr. Blackburn regarding plaintiff's request because she was only the acting chief while Arnold was out of the office and she did not feel comfortable making personnel decisions without approval. (Doc. 35-3 at 4-6.) Dr. Blackburn testified that he denied plaintiff's request to come to Birmingham on May 11, 2006, because it was made at the last minute, plaintiff's work assignment was at the Jasper clinic, and unless there was some extraordinary circumstance plaintiff would be expected to stay there during her duty hours. (Doc. 34-11 at 112-15; Doc. 34-12 at 6-7.)

**d. FEES equipment**

In January 2007, plaintiff requested that the VA purchase a piece of equipment for the Jasper clinic called a FEES unit. (Doc. 40-14 at 1; Doc. 33-2 at 78-81.) When the equipment arrived in May 2007, it was kept at the Birmingham VA, rather than at the Jasper Clinic. (Doc. 33-2 at 79-83.) In her deposition, Arnold explained that each year employees are queried as to what equipment they would like the VA to purchase if money for such equipment is available. Although plaintiff suggested the FEES unit purchase,

Arnold testified that it was never management's intent to send the unit to Jasper, because the FEES equipment is designed for a very limited patient population - patients who are bedridden or who cannot go in to a clinic to have "traditional modified barium swallows." (Doc. 45-2 at 56-58; Doc. 35-2 at 30-33.)  The Birmingham VA hospital had a similar type of machine that could perform the tests of a FEES station if an additional attachment was purchased for it.  (Doc. 33-2 at 80-81.)

**e. Boarding Process and Applications**

In the fall of 2006, the audiologists and speech pathologists participated in a boarding process, whereby they could apply for an upgrade in their pay grade and government service level based upon their job duties.  (Doc. 45-2 at 65-67; Doc. 40-17.) Each clinician was to submit a packet of forms and applications describing his actual duties and responsibilities to Human Resources to then be submitted to a regional board. The board would then make a determination as to whether or not the position would be upgraded.  (Doc. 45-2 at 66-67.)

Arnold provided the speech pathologists with sample forms and conducted a staff meeting to assist the clinicians with the boarding process.  (*Id.* at 67-68, 71-72.)  The only information provided to employees to help them complete their application was a packet sent by email to all pathologists, including plaintiff, and a tape of a conference call regarding the packet.  (*Id.* at 67-76; Doc. 35-3 at 21-22.)  The boarding process was discussed at one of the staff meetings, but plaintiff was not at the meeting because staff

15

meetings are held on Tuesdays, and plaintiff worked Thursdays and Fridays.  (Doc. 45-2 at 72; Doc. 33-2 at 130.)  Arnold instructed another employee to send a copy of the tape to plaintiff, and, after plaintiff complained that she had not received the tape, Arnold sent a copy by certified mail and extended the period for plaintiff to submit her packet.  (Doc. 45-2 at 73-79.)  By the time plaintiff received the tape she had already submitted her packet.  (Doc. 40-15 at 1.)

Arnold recommended to the board that certain employees' positions be upgraded because those employees performed additional duties over and above the traditional duties of a GS-12 speech pathologist.  (Doc. 45-2 at 81-86.)  Arnold testified that she did not recommend that plaintiff's position be upgraded because plaintiff only performed the usual GS-12 duties of a speech pathologist.  (*Id.* at 83.)  However, when the plaintiff worked at the Birmingham VA, she had performed some of the additional, nontraditional duties the other speech pathologists who were upgraded were performing.  (*Id.* at 85-86.)

**f. Position on Traumatic Brain Injury Team**

The Traumatic Brain Injury (TBI) Team is a group of representative healthcare providers from different disciplines who treat veterans suffering from traumatic brain injuries.  (Doc. 35-3 at 22-23.)  Plaintiff had been assigned as the speech pathologist to the TBI team since its inception in approximately 2003.  (Doc. 33-2 at 89.) There had been a lapse in the team for some time, but after Arnold became chief of the audiology and speech pathology department in 2006, there was a significant increase in the number

16

of veterans being treated for brain injuries due to the Iraq War and the team was revived. (Doc. 45-2 at 88-89.)  In May or June of 2007, plaintiff asked Arnold to place her on the TBI team, and Arnold said she would think about it.  (Doc. 33-2 at 89.)  However, Arnold appointed Faucett to the team.  (Doc. 45-2 at 87.)  Arnold testified that, when the referrals started increasing, she needed someone who worked full-time and needed someone in Birmingham because she did not know when the team would be meeting.  (Doc. 45-2 at 88-89.)  Plaintiff claims she was more qualified for the position than Faucett because she is licensed to practice neuropsychology and has a doctorate in speech pathology and a specialty in cognitive functions.  (Doc. 33-2 at 91-92; Doc. 35-3 at 100.)  Faucett has a masters in speech pathology.  (Doc. 35-3 at 100.)

**g.  Reprimands**

On April 27, 2007, Arnold conducted a staff meeting with the speech pathologists. (Doc. 35-7.)  In the meeting, Arnold directed plaintiff to begin treating patients, who previously had been assessed by other speech pathologists, over the telephone.  (Doc. 33-2 at 93.)  Plaintiff claims that the applicable standard of care set forth by the American Speech and Hearing Association (ASHA) requires the use of video phones to treat patients remotely, and, at the meeting, plaintiff complained that not using video phones would jeopardize plaintiff's certification with ASHA and that plaintiff would be forced to file an ethics complaint against Arnold.  (*Id.* at 93-97.)  Arnold testified that treating patients over video and/or telephone is always a supplement to face-to-face treatment and

17

that the VA has been conducting such remote treatment practices for 30 years.  (Doc. 45-2 at 3, 19, 143, 108-09.)

On June 11, 2007, Arnold wrote a memo of a proposed reprimand addressed to plaintiff concerning plaintiff's comments at the meeting.  (Doc. 35-7.)  According to Arnold, the reprimand was a result of plaintiff's argumentative and threatening behavior towards both Faucett and Arnold during the April 27, 2007 meeting.  (Doc. 45-2 at 103-04; Doc. 35-4 at 1-2, 7, 13; Doc. 35-6; Doc. 35-7.)  The proposed reprimand contained a second section in which Arnold proposed to reprimand the plaintiff based on an e-mail the plaintiff sent to a group of speech pathologists regarding a doctor who had undergone a sex change operation.  (Docs. 35-7, 40-17, & 40-18 at 4.)  The final version of the reprimand did not include the second part of the proposed reprimand regarding plaintiff's email about the doctor with the sex change operation; it only addressed plaintiff's comments at the April staff meeting.  (Doc. 45-2 at 116-17; Doc. 35-8.)

At another time, Arnold issued plaintiff a written reprimand regarding a web posting made by plaintiff on a VA national web site wherein plaintiff stated that the boarding process was very dependent on the service chief's recommendations and who the chief's friends were.  (Doc. 45-2 at 95-98.)  Plaintiff claims she did not mention Arnold by name in the posting, but Arnold issued plaintiff a letter of reprimand because Arnold considered it to be slander.  (*Id.* at 97-98.)

18

**h. Lack of Office Space & Alleged Constructive Discharge**

Plaintiff claims that she was dispossessed of her office in Jasper because she went to work one day at the end of 2008 after returning from sick leave and someone else was using her office.  (Doc. 33-2 at 105-06.)  Plaintiff testified that she was forced to answer telephones in the front office because she did not have an office.  (*Id.* at 106.)  In his deposition, Blackburn explained that in late 2008, there were several additional staff assignments to the Jasper Clinic, and all of the staff had to fill out paperwork in the break room at some point.  (Doc. 34-11 at 139-40, 145.)

Plaintiff contacted Arnold regarding the lack of office space, but after two weeks nothing had been done.  (Doc. 33-2 at 106.)  Blackburn was aware that plaintiff was unhappy that she had to share an office.  (Doc. 34-11 at 144-45.)  Plaintiff resigned about two weeks after notifying Arnold of the lack of office space, having not heard anything from Arnold.  (Doc. 45-1 at 73-74.)  Dr. Blackburn testified that, while some employees like plaintiff had office space that was predominantly used only by that employee, nobody had specific office space except for one of the doctors, and the rest of the space was used as needed.  (Doc. 34-11 at 140-41.)  When additional staff was added at the Jasper clinic, employees had to share offices because of the limited space.  (*Id.* at 139-45.)  Plaintiff resigned from her part-time position with the VA in late 2008 after being offered a full-time position at Cooper Green Hospital.  (Doc. 33-2 at 116-17.)  After plaintiff resigned, her position in Jasper was not replaced.  (Doc. 45-1 at 74.)

19

Plaintiff filed a third Complaint of discrimination on July 21, 2006.  (Doc. 35-10 at 17.)  In the Complaint, EEOC # 2001-0521-2006102200 ("EEOC # 2200"), plaintiff asserted that she suffered the following employment actions between February 2006 and July 2006 in reprisal for her past EEO activity: (1) falsely accused of fraudulent act and threatened; (2) public/personnel defamation of character by supervisor, (3) denial of legal representation opportunity, (4) supervisor failed to respond to employee requests in nondiscriminatory manner, (5) failure of BVAMC [Birmingham VA Medical Center] administration to respond to employee request for assistance, (6) BVAMC administration required employee to take annual leave time to come to BVAMC.  (*Id.*)  On July 26, 2007, plaintiff filed a Motion to Amend, requesting that her EEOC Complaint be amended to include other alleged retaliatory actions occurring between April 2006 and July 2007.  (Doc. 34-1 at 4-5.)  The Administrative Judge granted the Motion to Amend in August 2007.  (*Id.* at 5.)  After remand, the Office of Employment Discrimination Complaint Adjudication denied plaintiff's complaint in its entirety on April 17, 2008.  (*Id.* at 1.)  Plaintiff appealed that decision to the EEOC, which vacated the agency's final decision after finding that the record was insufficient for a determination on the merits because the agency had failed to address the incidents that were added by amendment. (*Id.*)

Plaintiff filed this action on July 18, 2008.  The Complaint contains the following counts: (1) retaliation and reprisal for past complaints of discrimination and

(2) constructive discharge in violation of 42 U.S.C. §§ 1981 and 2000(e), *et seq.*  (Doc. 6 at 6-8.)

### III.  DISCUSSION

## A. Res Judicata

Defendant first argues that plaintiff's retaliation claim is barred by the doctrine of res judicata.  (Doc. 32 at 25-28.)  The administrative judge in plaintiff's previous EEO investigation, #0034, concluded that the evidence did not support plaintiff's claim of retaliatory harassment.  (Doc. 33-5.)  It is undisputed that plaintiff did not appeal that decision to the EEOC or file suit in district court after it became final.  According to defendant, the administrative judge's decision therefore precludes plaintiff from raising any of the actions at issue which occurred prior to the hearing on that charge as alleged retaliatory actions in this suit.  (Doc. 32 at 25-28.)  Plaintiff responds that the claims in this action are not precluded because (a) the claims in this action relate to events occurring on dates different from the events at issue in EEOC Charge #0034 and the claims are not duplicated and (b) unreviewed administrative proceedings do not have preclusive effect on Title VII claims brought in district court.  (Doc. 40 at 38-41.)  Plaintiff argues that she is therefore entitled to a trial *de novo*.  (*Id.* at 39-40.)

"*Res judicata*, or claim preclusion, bars a subsequent claim when a court of competent jurisdiction entered a final judgment on the merits of the same cause of action in a prior lawsuit between the same parties."  *Pleming v. Universal-Rundle Corp.*, 142

21

F.3d 1354, 1356 (11th Cir. 1998).  "[R]es judicata does not bar a claim that was not in existence at the time of the original action unless the facts underlying the claim were actually raised in that action."  *Singh v. U.S. Attorney Gen.*, 561 F.3d 1275, 1280 (11th Cir. 2009) (per curiam) (quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299 (11th Cir. 2001)).  Administrative agency determinations, such as the ALJ's decision in #0034, are entitled to preclusive effect.  *See Gardner v. Nicholson*, 181 F. App'x 961, 964 (11th Cir. 2006) (per curiam) (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)).  The VA issued a final order adopting the ALJ's decision in case #0034 on the merits.  (Doc. 33-5 at 1.)  The parties are the same and both suits alleged reprisal for prior EEO activity.  However, the time periods of that action and the present action do not overlap.  The last adverse act in EEO # 0034 occurred in December 2005, (doc. 33-5 at 7), while the earliest alleged adverse action in EEO # 2200, which gave rise to this lawsuit, occurred in February 2006, (doc. 6 ¶ 9A).  Therefore, this action is not precluded by the administrative decision in EEO # 0034.

Aside from res judicata, any claims in plaintiff's second EEOC charge that were also contained in her first EEOC charge are untimely due the 90-day limitations period for bringing Title VII actions.  *See* 29 C.F.R. § 1614.407.  Title VII actions "may not be brought more than 90 days after a complainant has adequate notice that the EEOC has dismissed the Charge."  *Santini v. Cleveland Clinic Florida*, 232 F.3d 823, 825 (11th Cir. 2000) (per curiam).  The ninety day period begins to run upon receipt of the right to sue

letter.  *Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524 (11th Cir.

1991); 42 U.S.C. § 2000e-5(f)(1).  "A Title VII plaintiff is not permitted to extend the 90-

day period 'by repeatedly filing broad, duplicative charges with the EEOC and obtaining

multiple right to sue letters.'"  *Croskey v. Big Lots Stores, Inc.*, 2007 WL 2023493, at *4

(M.D. Ala. July 9, 2007) (quoting *Dowdell v. Sunshine Biscuits, Inc.*, 90 F.R.D. 107, 116

(M.D. Ga. 1981)).  Where a plaintiff has filed more than one EEOC charge based on the

same facts, but failed to timely file suit after receipt of a notice of right to sue on the first

charge, courts have held that claims in a subsequent lawsuit that mirror claims raised in

the first EEOC charge are time-barred and due to be dismissed.  *See Labady v. Gemini*

*Soso Liang Lo v. Pan Am. World Airways*, 787 F.2d 827, 828 (2d Cir. 1986) (per curiam)

(holding that Title VII action was time-barred where action arose out of EEOC charge

that was based on exact same facts as a prior EEOC charge on which plaintiff had failed

to timely file suit); *Martinez v. Workforce Cent. Florida*, 2008 WL 1806119, at *4 (M.D.

Fla. Apr. 21, 2008) (holding that, because plaintiff did not file lawsuit within 90 days of

receipt of right to sue notice on first EEOC charge, plaintiff could not file second charge

and assert claim under Title VII based on acts described in the first EEOC charge);

*Cannady v. Automatic Data Processing, Inc.*, 2006 WL 3422424, at *10 (N.D. Ga. Nov.

28, 2006) ("Discriminatory acts alleged by Plaintiff in the second charge may form the

bases of claims, but only if those acts were not mentioned in his [prior EEOC] charge.").

Any claims in this lawsuit that were also part of plaintiff's prior EEOC charge (# 0034) will be barred as untimely.  The only claim that appears to be duplicated in both charges concerns plaintiff's removal from the TBI team.[4]  (*See* doc. 33-5 at 11, Incident No. 35; Doc. 34-1 at 5, Incident B11.)  This claim therefore is barred, although as discussed below, plaintiff cannot prove a claim of retaliation even including this allegation.  While plaintiff's other claims in the second charge allege adverse actions similar to those contained in the first charge – such as supervisors' failures to respond to emails or provide requested information, denials of training opportunities, and issues with plaintiff's transfer to Jasper and her performance measures, the allegations in the charges are not based on the exact same facts or time periods.  Accordingly, there is no duplication of claims, and the claims involved in this lawsuit are not barred or otherwise precluded, aside from plaintiff's claim regarding her removal from the TBI team.

---

[4]  In the first charge, plaintiff objects that on "April 29, 2005, her supervisor failed to advise the Chair of the Traumatic Brain Injury (TBI) team that she would be removed from the team because of her reassignment."  (Doc. 33-5 at 11.)  Her second amended charge alleged that in June 2007, defendant "removed the complainant from the traumatic brain injury team and replaced the complainant with a less qualified speech pathologist."  (Doc. 34-1 at 5.)

## B.  Merits of Retaliation Claim

Count I of the Amended Complaint alleges that defendant violated Title VII and

42 U.S.C. § 1981 by retaliating against plaintiff for engaging in protected EEO activity.[5]

In relevant part, Title VII provides the following definition of retaliation:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because he has
> opposed any practice made an unlawful employment practice by
> this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Plaintiff alleges that defendant retaliated against her for filing

complaints of discrimination against defendant in 2005. (Doc. 6 at 2 ¶ 8.)

In Title VII claims, the plaintiff bears "'the ultimate burden of proving

discriminatory treatment by a preponderance of the evidence.'"  *Crawford v. Carroll*, 529

F.3d 961, 975 (11th Cir. 2008) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077,

1081 (11th Cir. 1990)).  The plaintiff may "satisfy her burden by presenting direct

evidence of an intent to discriminate or circumstantial evidence using *McDonnell*

*Douglas*'s burden-shifting framework."  *Id.* at 975-76.  "Under this framework, if the

plaintiff establishes a prima facie case, the burden shifts to the employer to 'articulate

some legitimate, nondiscriminatory reason' for the adverse employment action.  *Id.* at 976

(quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

---

[5]   The analytical framework for a Title VII retaliation claim also applies to retaliation
claims brought under 42 U.S.C. § 1981.  *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209,
1212-13 (11th Cir. 2008).  Accordingly, the court will conduct one analysis for both claims.

> As with claims of substantive discrimination, Title VII
> retaliation claims require that "[o]nce the plaintiff establishes [a]
> *prima facie* case, the employer must proffer a legitimate, non-
> discriminatory reason for the adverse employment action. If the
> employer offers such legitimate reasons for the employment
> action, the plaintiff must then demonstrate that the employer's
> proffered explanation is a pretext for retaliation."

*Id.* (alteration in original) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir.

1997)).

### 1. Direct Evidence

Evidence is direct when it is sufficient to prove the fact in issue without inference

or presumption. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997)

(citations omitted) (listing cases where the Eleventh Circuit has found direct evidence of

race and sex discrimination in employment and quoting the statements found to amount to

direct evidence). "Evidence that only suggests discrimination or that is subject to more

than one interpretation does not constitute direct evidence." *Id.* at 1189 (citations

omitted). Motive or intent is seldom capable of proof by direct evidence. *Perryman v.*

*Johnson Prods. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). In the Eleventh Circuit, "[t]o

qualify as direct evidence of discrimination, . . . a biased statement by a decision-maker

[must] be made concurrently with the adverse employment event, such that no inference

is necessary to conclude that the bias necessarily motivated the decision." *Williamson v.*

*Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) (per curiam)

(citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir.

1999)).  "If the plaintiff produces such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved."  *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) (citations omitted).

Plaintiff contends that the record in this case contains statements that constitute direct evidence of retaliatory motive.  Specifically, plaintiff points to statements she claims Arnold made when plaintiff asked her why Arnold had accused her of fraud relating to the conference trip ticket instead of asking plaintiff about it first.  (Doc. 40 at 41-42.)  Arnold answered plaintiff by saying,  "[W]e are doing all of this because of your past EEO - that EEO thing that you did."  (Doc. 35-12 at 40.)  Plaintiff then asked, "My EEO reprisal suit?" and Arnold responded, "Yes, your EEO thing."  (*Id.*)  Plaintiff also points to Pearce's testimony that plaintiff was transferred to the Jasper clinic because she was a "problem employee" as direct evidence of retaliatory motive.  (Doc. 40 at 42; Doc. 40-2 at 19.)

Defendant argues that these statements do not amount to direct evidence.  Defendant points out that "contrary to her present assertion, Plaintiff admitted in her response to a request for admission that she has no direct evidence of discrimination."  (Doc. 43 at 18; *see* Doc. 35-17 at 3 ¶ 1; Doc. 35-18 at 3 ¶ 1.)  Under Fed. R. Civ. P. 36(b), a matter admitted in response to a request for admission "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  The

Rule also states that a request for admission may cover not only facts but also "the application of law to fact, or opinions about either."  Fed. R. Civ. P. 36(a)(1)(A). Defendant's request that plaintiff admit "that you have no direct evidence of discrimination with respect to your allegations in your complaint," (doc. 35-17 at 3 ¶ 1), was a proper request under the Rule as an application of law to fact, and plaintiff's admission of this statement conclusively establishes that she has no direct evidence.  *See* Fed. R. Civ. P. 36 advisory committee's note (noting that an employee's admission that she acted within the scope of employment would be a proper admission of a matter involving the application of law to fact).

The purpose of Rule 36 admissions, as stated in the Advisory Committee notes to the Rule, is both to "facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that can be."  Allowing plaintiff to now allege direct evidence in opposition to summary judgment would defeat defendant's purpose in seeking the admission.  As the notes state:

> In form and substance a Rule 36 admission is comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial, rather than to an evidentiary admission of a party. Unless the party securing an admission can depend on its binding effect, he cannot safely avoid the expense of preparing to prove the very matters on which he has secured the admission, and the purpose of the rule is defeated.

Fed. R. Civ. P. 36 advisory committee's note (citations omitted).  Indeed, defendant objected to plaintiff's inclusion of this conversation in her statement of facts, arguing that "[t]o allow Plaintiff to change her position in this regard after discovery has been

completed prejudices the Defendant who could have otherwise requested Plaintiff provide more information during discovery to clarify an otherwise ambiguous statement." (Doc. 43 at 7 ¶ 64.) The court agrees with defendant.

Moreover, the court does not find that the statements at issue amount to direct evidence of retaliation. In *Merritt*, the Eleventh Circuit held that a statement made by the president of Dillard Paper Company to Merritt, an employee, constituted direct evidence of retaliation. 120 F.3d at 1190. After giving deposition testimony in a coworker's Title VII lawsuit that was favorable to the coworker's case and unfavorable to the employer, Merritt was terminated. *Id.* at 1183. When informing Merritt of his termination, Dillard's president stated that if the case had proceeded to trial, "we would have lost Dillard Paper Company," and told Merritt that "[y]our deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company." *Id.* The Eleventh Circuit reversed the district court's grant of summary judgment for the defendant on Merritt's Title VII retaliation claim, holding that the president's statements clearly showed that Merritt was fired because of his deposition testimony in the coworker's Title VII case, which is protected activity under Title VII. *Id.* at 1190. The court found that the statement was the same as if the company president had said, "Fire Merritt-he gave the most damning deposition testimony," and that Dillard had not offered any explanation for the meaning of the president's statement "if not that Merritt was being fired because his deposition testimony damaged Dillard's position in the Title VII lawsuit." *Id.* at

29

1190-91.  The court stated that the president's statement "conforms to the general pattern of statements constituting direct evidence found in our race and gender discrimination decisions."  *Id.* at 1190.

Neither Arnold's statement that she accused plaintiff of fraud "because of your past EEO - that EEO thing that you did," or Pearce's statement that plaintiff was transferred to the Jasper Clinic because she was a "problem employee" reveal direct evidence of retaliatory motive.  In *Merritt*, the company president explicitly referred to the plaintiff's involvement in protected activity as the reason for his termination.  *Id.*  In contrast to the statements in *Merritt*, Arnold's alleged statement to plaintiff, "[W]e are doing all this because of your past EEO - that EEO thing that you did," is ambiguous as to what "all this" refers to, and therefore, does not establish direct evidence of retaliation "without inference or presumption."  *Merritt*, 120 F.3d at 1189 (internal quotation marks and citations omitted).  It could be interpreted to mean that, because plaintiff filed two prior EEOC charges, the VA was careful to follow protocol relating to the allegation of fraud by having a union representative present at the meeting in April 2006.  It requires an inference to conclude that Arnold meant that plaintiff was under investigation for fraud because of her prior EEO activity, and, therefore, the statement does not amount to direct evidence.  Finally, the statement that plaintiff was being transferred to the Jasper Clinic because she was a "problem employee" is not direct evidence of retaliation because it does not in any way reference or hint at plaintiff's protected EEO activity as the

motivating factor for the transfer.  The statement could easily be interpreted to mean that plaintiff did not get along well with her coworkers, as Pearce explained.  (Doc. 40-2 at 19.)  For these reasons, the court finds that this evidence is more appropriately deemed circumstantial or indirect evidence, and, as such, may properly be used under a burden-shifting analysis of proof.

### 2. Prima Facie Case

A prima facie case of retaliation under Title VII requires the plaintiff to show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Crawford*, 529 F.3d at 970 (citation omitted).

#### a. Protected Activity

Title VII protects two types of activity through the "opposition clause" and the "participation clause" of the anti-retaliation provision.  *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  Under the "opposition clause," an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  *Id.* (quoting 42 U.S.C. § 2000e-3(a)).  The "participation clause" of Title VII's retaliation provision makes it unlawful for an employer to retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see also*

*Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278-79 (11th Cir. 2008) (holding that employee's filing a charge of discrimination with EEOC was protected activity for purposes of Title VII or Section 1981 retaliation claim).  It is undisputed that plaintiff engaged in protected activity under Title VII by filing an EEOC charge in 2005 (EEO # 0034).  Therefore, the first element of the prima facie case is satisfied.

        b. <u>Adverse Employment Action</u>

        Defendant first argues that plaintiff cannot establish a prima facie case because she did not suffer an adverse employment action.  (Doc. 32 at 29.)  Establishing the adverse employment action element of the prima facie case is crucial because "[t]he antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  The Eleventh Circuit has recognized that "the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related."  *Crawford*, 529 F.3d at 973 (footnote and citation omitted).  An adverse employment action in a retaliation case that has a "materially adverse effect" on the plaintiff is one that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* at 974 (quoting *White*, 548 U.S. at 68)).  "The challenged action must be materially adverse from the standpoint of a reasonable

employee." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (citing *White*, 548 U.S. at 68).

When a Title VII retaliation plaintiff alleges that adverse action was taken against her on more than one occasion, the court may consider the incidents individually or collectively in determining whether an adverse action exists. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1245 (11th Cir. 2001). Aside from termination, examples of adverse retaliatory actions include an unfavorable performance review that deprives an employee of receiving a merit pay increase, denial of a promotion, and transfer to a less desirable position in terms of pay or eligibility for pay increases. *See Crawford*, 529 F.3d at 973; *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1300 (11th Cir. 2005); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).

Plaintiff alleges that multiple actions taken by defendant amount to adverse actions. Specifically, plaintiff names the following incidents as adverse actions:

> [1] the Defendant's consistent failure to review with the Plaintiff [] patient case load numbers to justify her continued presence at the Jasper Clinic; [2] the Defendant's refusal to assist the Plaintiff in building a patient case load; [3] the refusal to change the Plaintiff's performance measures to reflect the low patient case load at the Jasper Clinic; [4] accusations of fraud against the Plaintiff regarding the falsification of a trip ticket that were reported to law enforcement; [5] denying the Plaintiff opportunities for training and to attend professional conferences; [6] forcing the Plaintiff to use annual leave to attend work related activities; [7] blatant misrepresentation regarding the placement and use of requested equipment at the Jasper Clinic (i.e., the FEES station); [8] Arnold's refusal to provide the Plaintiff information regarding the boarding process that would have or could have resulted in an upgrading of the Plaintiff's position; [9] denying the Plaintiff a place on the TBI team (which

33

she had previously held), and [10] the several reprimands taken against the Plaintiff.

(Doc. 40 at 44-45; *see also* Doc. 6 ¶¶ 9A-9N.)  In addition to these alleged adverse actions, the Amended Complaint also claims that plaintiff's reputation in the health care/speech pathology community was injured as a result of Arnold's conduct and that plaintiff was instructed to engage in "illegal and unethical conduct."  (Doc. 6 ¶¶ 9E, 9K.) The court will first examine each incident individually to see if it amounts to an adverse action and then will consider the incidents collectively.

The allegations regarding plaintiff's low patient caseload at the Jasper clinic, including defendant's alleged failure to review caseload numbers, refusal to help build a caseload, denial of reassignment back to Birmingham, and refusal to change performance measures to reflect the low patient caseload do not constitute adverse employment actions and also did not lead to adverse employment actions.  There is no evidence that plaintiff's job was in jeopardy as a result of the low number of patient visitations.  Plaintiff does not allege that she was paid by the patient, did not receive a decrease in salary for the low numbers, and never received an unfavorable review related to her low caseload.  In fact, plaintiff received ratings of "fully successful" in performance reviews twice while at the Jasper clinic.  (Doc. 34-8 at 16, 17, 28-29.)  Moreover, although plaintiff claims she was not helped in building a caseload at the Jasper clinic, it is undisputed that Arnold did suggest ways for plaintiff to increase her referrals, though they might not have been effective.

34

"Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Town of Lake Park, Fla.*, 245 F.3d at 1244.  An employee's transfer to a new position that does not affect the employee's salary, benefits, responsibilities, or eligibility for promotions does not amount to an adverse employment action as a matter of law.  *See, e.g.*, *Maniccia v. Brown*, 171 F.3d 1364, 1369 n.3 (11th Cir. 1999) (noting in dicta that employee's transfer, which did not affect plaintiff's pay or benefits, was not adverse action for purposes of Title VII retaliation claim); *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998) ("The transfer of an employee which results in a substantial reduction in the employee's income is an adverse employment action." (citation omitted)); *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994) (holding that a transfer to a position that did not affect the employee's salary but that reduced the employee's eligibility for salary increases, reduced her responsibilities, and required her to perform menial tasks was adverse employment action in first amendment retaliation case).  Although plaintiff saw fewer patients while at the Jasper clinic, her responsibilities themselves did not change and were not reduced.  In fact, plaintiff appears to have had more responsibility in Jasper than she did in Birmingham, as she was responsible for performing at least some audiology treatment in addition to her speech pathology duties.  (Doc. 33-2 at 101.) Accordingly, the court does not find that defendant's decision to transfer plaintiff to

Jasper and keep her there despite the low patient numbers was "*materially* adverse from the standpoint of a reasonable employee," or the type of action that would have dissuaded a reasonable worker from filing a charge of discrimination. *Coca-Cola Bottling Co. Consol.*, 516 F.3d at 978 n.52 (emphasis added) (citing *White*, 548 U.S. at 68).

The court finds that the fraud accusation amounts to an adverse action.  Arnold testified that, when she found out that plaintiff's name had been added to Tidwell's trip ticket for the National VA Conference, Arnold accused the plaintiff of fraud because she believed possible illegal activity had occurred.  (Doc. 45-2 at 34-35, 39-40.)  When asked in her depositions to recount any reprimands she had received, plaintiff testified that Arnold "was going to give me something on the day that she accused me of fraud," but that "[w]hatever it was, I didn't get it."  (Doc. 33-2 at 109, 112.)  Although she was not actually charged with fraud and did not receive a reprimand, plaintiff testified that she was told by VA security that her job was threatened as a result of the accusation.  (*Id.* at 119; Doc. 33-1 at 58.)  The court finds that being accused of illegal conduct is the type of action that would dissuade a reasonable employee from filing a charge of discrimination.

Next, the court finds that the allegations regarding denial of training opportunities and permission to attend professional conferences and requiring plaintiff to use annual leave to attend work-related activities do not amount to adverse actions.  In her deposition, plaintiff testified that the only specific denials of training opportunities she could remember were in response to her requests to attend the Texas and Tennessee VA

36

conferences, and she could not remember any specific incidents or dates where she was denied training in Birmingham.  (Doc. 33-2 at 102-03, 105.)  Plaintiff was allowed to attend the National VA conference in Texas, although she had to use annual leave.  She was not allowed to attend the VA conference in Tennessee, and, when asked in her deposition if plaintiff's attendance at the conference would have benefitted her and the services she was providing to veterans, Arnold responded, "I guess there is that potential . . . . "  (Doc. 45-2 at 27.)   However, plaintiff has the burden to prove her prima facie case, and she has not offered evidence to show that these actions adversely affected her. Plaintiff's having to use annual leave to travel to Birmingham on a day when she was supposed to be working at the Jasper clinic is also not an adverse action as a matter of law.  These are not the type of actions that would deter a reasonable employee from filing a complaint of discrimination.

Plaintiff also alleges that "[o]n April 29, 2006, the Plaintiff was informed that Arnold had expressed to leaders in the healthcare / speech pathology industry that Arnold had trust issues with the Plaintiff," and that "[s]uch conduct injured the Plaintiff's reputation in the healthcare / speech pathology industry."  (Doc. 6 ¶ 9E.)  However, as previously noted, this allegation is based on a hearsay statement made by someone at the National VA Conference.  Even if plaintiff could later present admissible testimony that Arnold had trust issues with the plaintiff, this is not an adverse action and plaintiff has not presented any evidence to support the claim that her reputation was actually injured.

Accordingly, the court rejects plaintiff's claim that the reference to Arnold's "trust issues" with plaintiff amounts to an adverse action.

The court also does not find that defendant's decision to use the FEES equipment in Birmingham instead of Jasper amounts to an adverse action.  At oral argument, plaintiff conceded that the decision not to send the FEES equipment to Jasper does not amount to an adverse action when viewed on its own.  The court does not find that the use and placement of the FEES equipment in Birmingham rather than Jasper is something that would deter a reasonable person from filing a complaint of discrimination.

A refusal to provide plaintiff with information relating to the boarding process, through which she could have applied for an upgrade in her position and pay grade, amounts to an adverse action.[6]  Plaintiff testified that the applications required "[v]ery specific wording" and "[y]ou had to kind of know what you were going for and understand what the boarding process was to be able to be successful."  (Doc. 33-2 at 84-85.)  Plaintiff claims that she did not receive certain materials that had been given out at a staff meeting until one week after the deadline for the boarding process, and although Arnold testified that she extended the application deadline for plaintiff, (doc. 45-2 at 77), plaintiff testified that "[e]verything she sent me was too late to be used," (doc. 33-2 at 84-85).  It is undisputed that Arnold recommended to the boarding committee that plaintiff

---

[6]Again, with regard to the evidence, the court is drawing all reasonable inferences in favor of the plaintiff.  However, it is arguable as to whether a reasonable jury could find that defendant "refused" to provide plaintiff with the boarding process information.

not receive a step or grade increase.  (Doc. 33-2 at 87; Doc. 45-2 at 82-83.)  The decision

not to recommend plaintiff for an upgrade would amount to an adverse action because the

evidence indicates that the effect of the upgrade would be a promotion, as it results in an

increase in salary.  *See Pennington*, 261 F.3d at 1267 ("[G]enerally the denial of a

promotion is an adverse employment action." (citation omitted)).

Plaintiff's removal from the TBI team, assuming it is not barred, is not an adverse

action.  There is no evidence that plaintiff's position on the TBI team resulted in an

increase in salary, was expected to lead to concrete professional opportunities, or was

associated with any other job benefit.  This is not the type of action that would deter a

reasonable person from filing a complaint of discrimination.

While plaintiff references "several reprimands taken against the Plaintiff," (doc. 40

at 45), only two specific reprimands are mentioned in the record.  First, plaintiff received

a reprimand as a result of her behavior and comments in the April 27, 2007 speech

pathologist staff meeting with Arnold where plaintiff objected to the instruction to begin

administering treatment to patients over the phone.  (Doc. 35-8.)  Arnold had issued

plaintiff a proposed reprimand for this incident that also addressed plaintiff's emailed

comments about the doctor who had a sex change operation, (doc. 35-7), but this was not

included in the final reprimand.  Arnold also issued plaintiff a letter of reprimand

regarding her comments on a national VA blog website about Arnold's alleged favoritism

during the boarding process.  (Doc. 45-2 at 96-98.)  The court finds that the issuance of

reprimands could amount to adverse actions.  To the extent that plaintiff claims that being

instructed to treat patients over the telephone itself was an adverse action, the court

rejects this argument.  Although plaintiff claims that such a method of treatment would be

unethical, receiving an instruction to treat patients over the telephone would not deter a

reasonable employee from filing a complaint of discrimination.

In sum, considered both collectively and individually, the only actions that could

be found to amount to an adverse action are the accusation of fraud, the alleged lack of

assistance and materials with respect to the boarding process, the decision not to

recommend plaintiff for a job reclassification, and the two reprimands.

c. Causation

Defendant next argues that plaintiff cannot show a causal connection between her

EEO charges and the alleged adverse actions.  (Doc. 32 at 30.)  To show a causal

connection between the adverse action and the employee's protected conduct, "'a plaintiff

merely has to prove that the protected activity and the negative employment action are not

completely unrelated.'" *Pennington*, 261 F.3d at 1266 (quoting *Olmsted v. Taco Bell

Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).  While the causal link requirement is

interpreted broadly, *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571 (11th Cir.

1993), "merely showing that the alleged adverse action occurred sometime after the

protected expression does not establish the causation element–for temporal progression to

be enough, the events must be in 'very close' proximity." *Coca-Cola Bottling Co.*

40

*Consol.*, 516 F.3d at 978 n.52 (citation omitted).  The employee must also show that the

defendant was aware of the protected conduct.  *See Clover v. Total Sys. Servs., Inc.*, 176

F.3d 1346, 1354 (11th Cir. 1999) (reversing a jury verdict for the plaintiff on a Title VII

retaliation claim where the evidence did not show that the employer was aware of

employee's protected activity).  It is undisputed that Arnold and Blackburn were aware of

plaintiff's prior EEO activity.  (Doc. 34-10 at 5-6; Doc. 34-12 at 5-6.)

Plaintiff argues that Arnold's statement in April 2006 that "we are doing all of this

because of your past EEO - that EEO thing that you did," is circumstantial evidence of a

causal connection between the alleged retaliatory acts and plaintiff's 2005 EEOC charge

(#0034).  (Doc. 40 at 45.)  Although the court rejected plaintiff's contention that Arnold's

statements amount to direct evidence of retaliation, they are properly considered as

circumstantial evidence of causation.  The court finds that Arnold's statements, which

apparently reference plaintiff's 2005 EEOC charge (#0034), constitute circumstantial

evidence of causation.  However, because Arnold made the statement in response to

plaintiff's questions about Arnold's actions relating to the fraud accusation, the statement

is only evidence of causation for that incident.  Moreover, the statement cannot logically

serve as evidence of causation for anything that occurred after the statement was made,

which includes defendant's alleged refusals to provide information relating to caseload

numbers in Jasper, the denial of plaintiff's request to attend the audiology conference in

Tennessee (spring 2007 or 2008), the denial of plaintiff's request to travel to the

Birmingham VA during work hours (May 2006), the boarding process (September 2006), the decision to keep the FEES equipment in Birmingham (May 2007), plaintiff's loss of a position on the TBI team (June 2007), and the June 2007 reprimand resulting from plaintiff's behavior in an April 2007 meeting.  The only incidents at issue in this lawsuit known to have occurred prior to April 2006 are certain dates between February and April 2006 when the plaintiff requested transfer back to Birmingham and her requests for information regarding her caseload at Jasper.[7]  (Doc. 33-1 at 50-51; Doc. 6 ¶ 9A.) However, the court has already decided that defendant's decision not to permit the plaintiff to transfer to Birmingham and other issues related to plaintiff's low caseload at the Jasper clinic are not adverse actions.

Plaintiff next claims that "Blackburn's direct involvement in both the Plaintiff's prior EEO activity, as well as the claims in the case at bar, also create the causal connection."  (Doc. 40 at 47.)  Blackburn's involvement in plaintiff's prior EEO activity and the claims at issue in this lawsuit would only be relevant if the protected activity and the alleged retaliatory acts occurred within a close enough time period to infer a causal connection.  "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citation omitted).  Here, plaintiff alleges defendant

---

[7]  The record does not indicate when plaintiff received the reprimand for her comments about Arnold on a VA blog.

retaliated against her for filing an EEOC charge of discrimination in June 2005 (EEO #
0034).  (Doc. 6 ¶ 8.)  The first alleged retaliatory act at issue in this lawsuit occurred in
February 2006.  (*Id.* ¶ 9A.)  The approximately eight month time span between plaintiff's
statutorily protected activity and the first alleged retaliatory act is too long as a matter of
law to create an inference of a causal connection.  *See, e.g.*, *Thomas*, 506 F.3d at 1364
(three to four month disparity between the statutorily protected expression and the adverse
employment action not close enough to meet causation element of plaintiff's Title VII
retaliation claim); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (three month
proximity between protected activity and adverse employment action insufficient to create
a jury issue on causation element of plaintiff's FMLA retaliation claim).

Since the earliest of the acts at issue in plaintiff's complaint is too far removed
from the protected activity to create a causal connection, each subsequent alleged adverse
action, which is even further removed from the plaintiff's protected activity, also cannot
meet the causation requirement.  Aside from Arnold's reference to plaintiff's prior EEO
activity at the time of the fraud accusation, none of the other alleged adverse actions are
accompanied by the slightest amount of evidence indicating a causal connection to
plaintiff's EEO activity.  The involvement of Blackburn - or Arnold - in the incidents at
issue in this lawsuit, without more, is not enough to create a causal connection to the
plaintiff's protected activity.

d. Burden-shifting

Defendant argues that it has offered legitimate, nondiscriminatory reasons for all of its employment actions and that plaintiff has not established pretext. (Doc. 32 at 30-32; Doc. 43 at 19.) Once a Title VII retaliation plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Pennington*, 261 F.3d at 1266. "The employer 'need not persuade the court that it was actually motivated by the proffered reasons.'" *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (quoting *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "Rather, if the employer 'articulat[es] one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination.'" *Id.* (alteration in original) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)).

Defendant argues:

> [m]any of the issues Plaintiff complains of - including allegations directed to her assertion that the Jasper clinic does not have adequate caseload for a speech pathologist to be assigned there, and her complaint regarding placement of the FEES equipment at the Birmingham VA Hospital rather than the Jasper clinic - are common management decisions which Plaintiff merely disagrees with.

(Doc. 32 at 30.) The only adverse employment action that also has some evidence of causation is plaintiff's fraud accusation. Arnold testified that she accused the plaintiff of fraud because, she explained, "[I]f you have filled out a trip ticket saying that you are

44

going to drive a government car, the only person authorized to go in that government car is another government employee on authorized absence." (Doc. 45-2 at 36.) Because she had signed the trip ticket just for Tidwell, and later plaintiff's name also appeared on the ticket, she felt that something was wrong. (*Id.* at 40.) This is a legitimate, nondiscriminatory reason for accusing the plaintiff of fraud, as it is unrelated to her EEO activity.

The court has found that plaintiff did not offer sufficient evidence of causation to show that the other challenged employment actions were taken in retaliation for plaintiff's protected activity. However, even assuming plaintiff had established a causal connection between these actions and her protected activity, defendant has offered legitimate, non-retaliatory reasons for each challenged employment action. Arnold testified that she initially did not give plaintiff permission to attend the National VA conference in Texas and required her to use annual leave to attend the conference because the VA had limited funds and could only pay for one speech pathologist to attend. Likewise, Arnold testified that she did not allow plaintiff to attend the audiology conference in Tennessee because it was for full-time audiologists and enrollment was limited. Blackburn denied plaintiff's request to travel to the Birmingham VA in May 2006 during work hours because she believed plaintiff's time would be better spent developing a caseload in Jasper, plaintiff had made the request at the last minute, and plaintiff was expected to stay in Jasper during her duty hours. Regarding the FEES equipment, Arnold testified that it was never

management's intent to send the unit to Jasper because it is only used on a limited patient population.

The evidence shows that the purpose of the Community Based Outpatient Clinics is to provide treatment to veterans in outlying communities, and Blackburn testified that plaintiff was transferred to Jasper in order to provide speech pathology services "closer to where veterans were." (Doc. 34-11 at 40.)  Arnold also testified that she and Blackburn wanted to keep plaintiff at the Jasper clinic in order to meet the VA's goal of providing specialty care at CBOCs.  (Doc. 45-1 at 66-67.)  Pearce testified that plaintiff was transferred in part because she was a "problem employee" and did not get along with the other employees in her department in Birmingham.  (Doc. 40-2 at 19.)  Arnold testified that, while plaintiff claims she was denied materials and equipment at the Jasper clinic, plaintiff would have been provided materials if she had asked for them.  (Doc. 45-1 at 74-75.)  Arnold testified that the VA denied plaintiff's requests for patient information relating to her assignment to Jasper due to patient confidentiality reasons.  (Doc. 45-2 at 11-12.)

Regarding the boarding process, Arnold testified that, when she found out that plaintiff had not been provided some of the materials, she sent another copy to plaintiff by certified mail and extended the deadline for plaintiff's submission of the packet.  Arnold also explained that she did not recommend that plaintiff's position be upgraded because plaintiff only performed the usual GS-12 duties of a speech pathologist, and the other

46

employees she recommended for an upgrade performed additional duties above the usual duties of a GS-12 speech pathologist.  Arnold testified that she chose Faucett for the speech pathologist position on the TBI team because there had been a significant increase in the number of veterans with brain injuries as a result of the Iraq War, she needed a full-time speech pathologist who could meet the needs of the team, and she needed someone in Birmingham because she was not sure when the meetings would be held.

Regarding the VA's instruction to treat patients over the phone, Arnold testified that this was a standard treatment practice that the VA had used for 30 years and that it was always conducted as a supplement to face-to-face treatment.  The evidence also shows that Arnold had recommended that plaintiff conduct follow-ups by phone of patients that had been treated at the Birmingham VA Hospital at least since December 2006 as part of plaintiff's performance plan for meeting her performance measures and to alleviate some of the workload of the Birmingham speech pathologists.  (Doc. 34-8 at 32.)   Finally, the evidence shows that there were legitimate, nondiscriminatory reasons for issuing plaintiff the two reprimands she received, one for her allegedly threatening behavior in a staff meeting and another for writing negative comments about Arnold on a blog.

The court finds that all of the defendant's asserted reasons for its actions are legitimate and nondiscriminatory; therefore, the burden shifts back to the plaintiff to show that the reasons offered by defendant as justification for its actions were not its true

reasons. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). In a Title VII retaliation case, "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Pennington*, 261 F.3d at 1266 (citation omitted). "The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Crawford*, 529 F.3d at 976 (internal quotation marks and citation omitted). A plaintiff may show pretext either by offering evidence that the defendant more likely than not acted with a retaliatory motive, or by showing that the defendant's preferred reasons for its actions are not credible. *Alvarez*, 610 F.3d at 1265. A plaintiff's burden is to show not just that the defendant's proffered reasons for the employment action were ill-founded but that unlawful discrimination was the true reason. *Id.* at 1267 (citations omitted). The court will not sit as a "super-personnel department," and will not "second-guess the wisdom of an employer's business decisions - indeed the wisdom of them is irrelevant - as long as those decisions were not made with a discriminatory motive." *Id.* at 1266 (internal quotation marks and citations omitted). "[This] is true no matter how medieval a firm's

48

practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." *Id.* (internal quotation marks and citation omitted).[8]

Plaintiff claims that Arnold's statements at the time of the fraud accusation, when Arnold allegedly referenced plaintiff's prior EEO activity by saying "that EEO thing that you did," is "significant evidence of pretext." (Doc. 40 at 48.) The court disagrees. Arnold's statement is ambiguous and does not contradict the defendant's proffered nondiscriminatory reasons for its actions regarding the trip ticket incident, specifically, that Arnold felt a need to investigate the addition of plaintiff's name on the ticket because her absence had not been authorized.

Plaintiff further claims that there are "inconsistencies, incoherencies and contradictions" in the defendant's explanations for its actions that reveal evidence of pretext. (*Id.*) Plaintiff claims that there was a "total lack of data and information" to show that there was a sufficient caseload in Jasper to justify plaintiff's presence there. (*Id.*) Plaintiff notes that, after informing Arnold and Blackburn about the lack of patients in Jasper, she repeatedly requested information on patient numbers in Jasper and information on which Arnold and Blackburn based their denials of her requests to be reassigned to Birmingham. Plaintiff points out that this information was never provided to her, not even during the discovery phase of this lawsuit, leading plaintiff to the conclusion that "[i]t is apparent that this information never existed," and that there never

---

[8]By quoting this language, the court is not suggesting such actions occurred in this case.

was a sufficient patient caseload in Jasper to justify plaintiff's presence there.  (*Id.* at 49.)
Without citing to evidence, plaintiff contends that Pearce, Hussain, and Tidwell all noted
at some point that there was not a sufficient caseload at the Jasper clinic to justify the
plaintiff's assignment there.  (*Id.* at 49.)  Finally, plaintiff points to alleged
inconsistencies in the record regarding whether Blackburn had discussed the idea of
assigning plaintiff to Jasper with Pearce and regarding whether plaintiff got along with
the other employees at the Jasper clinic.  (*Id.* at 50.)

　　　　None of the arguments advanced by plaintiff contradict any of the reasons offered
by defendant for its actions and, more importantly, plaintiff's arguments fail to show that
the reasons offered by defendant were a pretext for a retaliatory motive.  Even if it is true
that there is no information, and that there never was any information, to show a need for
a speech pathologist in Jasper based on patient numbers, it still could be true that
defendant wanted one there in order to serve the outlying community, as Blackburn and
Hussain testified.  Even if plaintiff was transferred because she was a "problem
employee," that is not necessarily inconsistent with a desire to serve Jasper.  Also, even if
it was a bad business decision to keep plaintiff in Jasper or to take any of the other actions
at issue, plaintiff would be afforded no relief by her retaliation claim.  *See Alvarez*, 610
F.3d at 1266 (citations omitted) (noting that the wisdom of an employer's business
decisions is irrelevant as long as the decision was not made with discriminatory motive).
None of the arguments about pretext advanced by plaintiff show that defendant kept

plaintiff in Jasper, recommended that her position not be upgraded during the boarding process, refused to allow her to attend VA conferences, or took any of the other alleged adverse actions in retaliation for plaintiff's EEO activity.  Plaintiff has failed to point out inconsistencies or contradictions in the actual reasons offered by defendant for its actions. Accordingly, plaintiff has not met her burden of showing that defendant's reasons for its employment decisions were a pretext for retaliation.

Because no reasonable jury could find that plaintiff suffered adverse actions that were causally connected to her prior EEO activity or that defendant's proffered reasons for its actions were merely a pretext for unlawful actions, summary judgment is due to be granted in favor of defendants on plaintiff's retaliation claim.

## C. Constructive Discharge Claim

In her Amended Complaint, plaintiff claims that she was constructively discharged because she "was removed from her office and thus had no office in which to perform her work," "was receiving no continuing education, nor training and very few if any patients," and "was being threatened with and receiving disciplinary actions that were unfounded."  (Doc. 6 at 7.)  "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal quotation marks and citations omitted), *cert. denied*, 130 S. Ct. 1536 (2010).  A constructive discharge plaintiff must show that the work environment and conditions were so

51

unbearable that a reasonable person in that person's position would be compelled to resign. *Id.*  The threshold for establishing a constructive discharge claim is "quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (per curiam) (holding that being berated in public by supervisor was not sufficient to show constructive discharge); *compare Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir. 2003) (holding that withdrawn reprimand, unsubstantiated claim of unequal pay, and workplace rumor that employer planned to fire employee based on employee's race did not support Title VII constructive discharge claim) *with Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021-22 (11th Cir. 1994) (holding that evidence supported lower court's judgment that employee was subjected to constructive discharge as retaliation for engaging in statutorily protected activity under Title VII where her supervisor engaged in a series of fierce verbal confrontations with her, spit in her face, placed her on probation, and gave her unjustified work evaluations).

The court first notes that plaintiff's constructive discharge claim was not a part of her EEOC charge filed before this lawsuit.  Prior to filing a Title VII action in federal court, a plaintiff must file a charge of discrimination with the EEOC and receive statutory notice from the EEOC of her right to sue the respondent named in the charge.  42 U.S.C. § 2000e-5(f)(1); *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (per curiam).  "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to

permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Id.* (alteration in original) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983)).  Judicial claims are allowed if they "amplify, clarify, or more clearly focus the allegations in the EEOC complaint," but allegations of new acts of discrimination are inappropriate.  *Id.* (internal quotation marks and citations omitted).

In light of the exhaustion requirement, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (internal quotation marks and citation omitted), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003).  "Courts are nonetheless 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII],'" and the "'scope of an EEOC complaint should not be strictly interpreted.'" *Gregory*, 355 F.3d at 1280 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460-61, 465 (5th Cir. 1970)).[9]

Plaintiff testified that she thought that the constructive discharge claim was added to her EEOC charge (# 2200) that preceded the filing of this action.  (Doc. 33-2 at 116.) However, the administrative judge granted plaintiff's Motion to Amend that charge in an order dated August 31, 2007, three months *before* the alleged constructive discharge

---

[9]  The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

occurred, and the incidents the judge accepted for amendment, designated as "(B)(8)-(B)(12)" in the EEOC decision, only include events spanning from April 2006 to July 2007. (*See* doc. 34-1 at 1, 2, 4-5.) The EEO decision for charge # 2200 was issued on November 5, 2008, (doc. 34-1 at 10), and plaintiff claims she was constructively discharged in November 2008, (doc. 33-2 at 116-17). Therefore, plaintiff's constructive discharge claim was not included in EEO # 2200. However, since EEOC charge # 2200 contains claims of low patient caseload, lack of assistance in building a caseload, and denial of equipment, (doc. 34-1 at 3-5), which are also alleged to be part of the basis for plaintiff's constructive discharge claim, the court will construe the scope of plaintiff's amended EEOC charge broadly and assume that plaintiff's constructive discharge claim is not barred.

Defendant claims that plaintiff cannot establish a constructive discharge claim because the incidents at issue would not compel a reasonable person to resign their employment. (Doc. 32 at 33.) Plaintiff claims that she was constructively discharged as a result of her "insufficient patient case load," being denied assistance to build a caseload, having "no equipment or materials with which to perform her duties," and being "dispossessed of her office." (Doc. 40 at 52.) Plaintiff testified that she returned from sick leave to find another health care provider using her office to treat a patient and that she "didn't have an office if a patient did come in." (Doc. 33-2 at 106.) After contacting

Arnold about her situation and not receiving a response after two weeks, plaintiff

resigned.  (*Id.* at 106, 116.)  The Complaint further alleges:

> the Plaintiff was removed from her office and thus had no office in which to
> perform her work.  She was receiving no continuing education, nor training
> and very few if any patients.  She was being threatened with and receiving
> disciplinary actions that were unfounded.  Any reasonable person . . . would
> have felt compelled to resign.

(Doc. 6 ¶ 14.)

The evidence does not support plaintiff's claim of an alleged constructive

discharge.  The court emphasizes that, although the evidence is viewed in the light most

favorable to the plaintiff for purposes of summary judgment, the plaintiff is only entitled

to reasonable inferences from the record, and the court does not have to accept a party's

version of the facts when it is clearly contradicted by the record.  *Scott*, 550 U.S. at 380;

*See also Graham*, 193 F.3d at 1282; *Fitz*, 348 F.3d at 978 (affirming summary judgment

for employer on plaintiff's Title VII constructive discharge claim and rejecting plaintiff's

claim of unequal pay as evidence of constructive discharge where the court did not find

evidence in the record of unequal pay, the plaintiff's brief pointed to none, and other

similarly situated Caucasian employees were treated equally).  Regarding alleged

unfounded disciplinary actions, the evidence shows that plaintiff only received two

written reprimands, and the defendant has provided a legitimate, nondiscriminatory

explanation for each one.  Although plaintiff was accused of fraud regarding the trip

ticket to the Texas conference, no charges were filed and she did not receive a reprimand

as a result of that incident.  Regarding a denial of training opportunities, plaintiff was eventually allowed to attend the Texas conference, and she testified that she could not recall being denied any training opportunities in Birmingham.  The undisputed evidence also shows that Arnold gave plaintiff suggestions for ways to increase her caseload in Jasper.

Regarding her claim that she was dispossessed of her office, the undisputed evidence shows that there was insufficient office space at the Jasper clinic, employees had to share office space, and all employees had to fill out paperwork in the break room at times.  Plaintiff did not provide evidence to show and did not even allege that there was an instance when she was denied office space to treat her patients when they came to the clinic.

The plaintiff directs the court to *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551 (11th Cir. 1997).  In *Poole*, the court reversed a lower court's grant of summary judgment to an employer on the plaintiff's ADEA constructive discharge claim, finding that issues of material fact existed as to whether the employee was constructively discharged.  *Id.* at 553.  The plaintiff in *Poole* was told one day, after working for her employer as an executive secretary for almost two years, that she was being relieved of all existing responsibilities.  *Id.* at 552.  Other employees were instructed not to speak to her, she was given only a chair with no desk, and she was given no place to store her

belongings except in boxes.  *Id.*  The plaintiff alleged that "no duties or responsibilities attached to her new position."  *Id.*

The record shows that, unlike the plaintiff in *Poole* who was singled out for unfavorable treatment, deprived of all professional responsibilities, deprived of any semblance of office space, and isolated from the other employees, plaintiff here was forced to deal with a situation of crowded office space that affected all employees at the clinic.  Although she did not have many patients, she was not stripped of responsibilities; nothing in the record indicates that plaintiff was not allowed to see patients when they arrived and was instead forced to remain idle.

Plaintiff has failed to show a genuine issue of material fact regarding whether she was constructively discharged.  No reasonable jury could find that a reasonable employee in plaintiff's position would have been compelled to resign.  The court also finds that plaintiff has presented no evidence of causation to link the alleged constructive discharge to her EEO activity aside from the evidence already discussed, which the court has rejected.  Further, plaintiff's alleged constructive discharge occurred in November 2008, which is too far removed from the time she filed a complaint to create the necessary causal connection based on temporal proximity alone.  *See Thomas*, 506 F.3d at 1364.  Accordingly, defendant is entitled to judgment as a matter of law on plaintiff's claim of constructive discharge..

### IV. CONCLUSION

For the foregoing reasons, the court finds that defendant's Motion for Summary Judgment, (doc. 31), is due to be granted.  An Order granting defendant's Motion will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 29th day of March, 2012.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE